Eastern District of Kentucky
FILED
APR 18 2007
AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2005-199 (WOB)

| | |
|---|---|
| THE COMMONWEALTH OF KENTUCKY, ENVIRONMENTAL AND PUBLIC PROTECTION CABINET | PLAINTIFF |
| UNITED STATES OF AMERICA | INTERVENING PLAINTIFF |
| TIM GUILFOYLE | INTERVENING PLAINTIFF |
| VS. | |
| SANITATION DISTRICT NUMBER 1 OF NORTHERN KENTUCKY | DEFENDANT |

MEMORANDUM OPINION AND ORDER

This matter is before the court on the motion of the original plaintiffs and defendants to approve and enter a consent decree resolving this litigation. The individual intervening plaintiff objects to the entry of the decree on grounds which will be discussed below.

The parties are: Plaintiff, the Commonwealth of Kentucky, Environmental and Public Protection Cabinet; Defendant, the Sanitation District Number 1 of Northern Kentucky; Intervening Plaintiff, The United States of America; and Intervening Plaintiff, Tim Guilfoyle.

I. ANALYSIS

The court has thoroughly studied the decree and commends the industry of counsel in

1

translating it into English and presenting it in graphic manner at the oral argument.

The court is of the view that the implementation of the decree will go a long way toward offering effective solutions for the problems it addresses. It is not perfect, but it is perhaps the best that can be done considering the long-standing but constantly evolving nature of these problems.

### A. BACKGROUND

The consent decree addresses severe environmental problems that have plagued the Northern Kentucky region, not only for years, but for generations. In the late 1960's, the undersigned, then City Attorney of the City of Highland Heights, was involved in extensive litigation in the Campbell Circuit Court, before Judge Frederick Warren, concerning sewer overflows in the City of Wilder. Wilder sits at the bottom of a steep ridge and Highland Heights at the top. Simply put, storm water was getting into the sanitary sewers in Highland Heights, which condition resulted in sewer overflows of the trunk lines in Wilder, due to the hydrostatic pressure caused by the difference in altitude of several hundred feet. Such situations are not uncommon in this region.

According to the record presented in support of the consent decree, similar and even worse sewer problems of various kinds are still endemic throughout the region. The consent decree mentions 106 locations at which sanitary sewer overflows are occurring. Due to development in the area and other factors, the number of overflows is constantly evolving, as new ones appear and old ones are corrected. (Consent Decree, ¶ 9).

Practitioners of water and sewer environmental law are lamentably prone to the use of jargon, such as referring to a treatment plant as a "DCWWTP" or a "ERWWTP," or a sanitary

sewer overflow as a "SSO." This arcane language has the unfortunate effect of resulting in sentences like this:

> "The LTCP component of each Watershed Plan shall include . . . .
> (c) the results of an evaluation of peak flow treatment capacity for the DCWWTP and any WWTP that will receive additional flow based on any LTCP project. [T]he district shall use as guidance the EPA publications "Improving POTW Performance Using the Composite Correction Approach . . . ."

Consent Decree pp. 21-22.

Every profession has its jargon, but that used in this case makes the Internal Revenue Code seem like a model of plain English.

The unfortunate result of this opaque language is that it obscures the true import of the consent decree and the vital importance of solving the problems it addresses. Talking about "106 SSO's" camouflages the fact that there are 106 places where raw sewage (and other stuff that is flushed down toilets) is backed up in somebody's basement, or fouling up their yard or contaminating our brooks, creeks and rivers. If the language were clearer, the public might more readily accept the 20% increase in its sanitation fees that will be required to implement the consent decree.

Sanitary sewer overflows are only one type of problem covered by the consent decree. Reference is made to the decree itself for further elaboration.

### B. OBJECTIONS TO THE CONSENT DECREE

This court reviews the decree under an arbitrary and capricious standard. *United States v. Akzo Coatings of America, Inc.*, 949 F.2d 1409, 1424 (6th Cir. 1991). Therein, the Sixth Circuit stated that "in this highly technical area, decisions concerning the selection of remedies should be left to the EPA, and those decisions should be accepted or rejected - not modified - by the district

3

court under an arbitrary and capricious standard." *Id.*

The principal objections to the consent decree are:

1. The objectors disagree with the priorities established by the decree in addressing the problems it seeks to correct, e.g., too much will be expended on outlying areas, as opposed to the inner cities.

2. The decree will take too long to implement completely.

3. The decree is not specific enough in the corrective measures required.

4. The decree calls for insufficient public input.


The court is impressed with the sincerity of the objectors and their dedication to the environment. The court must conclude, however, that to delay implementation of the decree would be more harmful to the public health and the environment than to approve it immediately, so that the agencies concerned can begin or continue the substantial corrective measures it requires. Several capital improvements are called for by the decree, which must be designed and put out for bid. In the court's mind moving forward and obtaining momentum is the overwhelming consideration.

Turning to the specific objections:

1. The court must yield to the expertise of the agencies in the order and manner in which the problems are addressed by the decree. The problems are geographically extensive and extremely complex. The court cannot say that the priorities set forth in the decree are arbitrary and capricious.

4

2. The time limits in the decree are outside limits. Hopefully, the corrective measures will proceed more quickly. Continued supervision by the court should help achieve reasonable progress.

3. It is true that the decree is not specific as to many measures to be undertaken. Its approach is to require the filing of plans addressing several goals for remedial action, usually within six months to a year from entry of this decree. For example, plans for a grease control program, a backup power program for pump stations, and a sewer response plan must all be submitted in addition to many others. Specific deadlines are set by the decree for these submissions.

The objectors are apprehensive that extensions will be granted and/or the plans may not be implemented. This certainly is not a trivial concern. Many well-intentioned plans for this nation and region have been formulated over the years. The court is aware that they tend to end up gathering dust on some shelf because of political exigencies. A good example is the Northern Kentucky Area Planning Commission's plan for metro government for Boone, Campbell and Kenton Counties. Considering this time of year, a simplified tax code also comes to mind. Then there was the proposed new Kentucky Constitution of 1966. But why go on? The examples are endless. The agencies have assured the court of their good faith in carrying out the provisions of the consent decree.

The court notes that the consent decree contains the following provision, granting the court continuing jurisdiction and supervisory powers over the implementation of the decree:

### XIX. CONTINUING JURISDICTION

The Court shall retain jurisdiction to effectuate and enforce the terms and

5

conditions and achieve the objectives of this Consent Decree, and to resolve disputes arising hereunder as may be necessary or appropriate for the construction, modification, implementation, or execution of this Consent Decree.

This provision gives the court far more supervisory power over the enforcement of the decree than it would have if it did not sign it. The provision gives the court broad equitable powers to assure that the decree is carried out in good faith to achieve the goals set forth in it.

4. The continuing jurisdiction provision also assures public input, since any interested party may be heard on the plans to be submitted. Anyone who is not a party can intervene under Fed. R. Civ. P. 24.

Therefore, the court concludes that it is in the public interest that the consent decree be approved forthwith.

Therefore, the court being advised,

**IT IS ORDERED** as follows:

1. That the objections to the consent decree be, and they are, hereby **overruled;**

2. That the motions to enter the Consent Decree (Docs. #7 and #26) be, and they are, hereby **granted;**

3. That the consent decree will be signed by the court and become effective immediately according to its terms;

4. That all future filings in this case shall be in English, rather than bureaucratese;

5. That no more than three "initialisms" (e.g. "ERWWTP") be used in any document filed in the future, failing which the document will be returned to the filer for correction.

6. That the court will hold periodic status conferences concerning the good faith

6

implementation of the consent decree, the first such conference being hereby set on **Thursday, December 13, 2007 at 1:30 p.m.**

This 18th day of April, 2007.

*William O. Bertelsman*
**WILLIAM O. BERTELSMAN, JUDGE**